20096

SOUTHEASTERN ASSOCIATES, INC., Respondent, v. S-C MOTOR
INN CORP. et al., Appellants

(218 S. E. (2d) 422)

*Messrs. Nexsen, Pruet, Jacobs & Pollard,* of Columbia, *for Appellants,* cite:

*Messrs. Bryant, Fanning & Yarborough,* of Orangeburg, and *Clement, Wheatley, Winston & Ingram,* of Danville, Va., *for Respondent,* cite:

September 19, 1975.

BUSSEY, Justice:

This action was commenced by the responden,t Southeastern Associates, Inc. (purchaser), a Virginia corporation, to rescind a contract ot buy 24 (plus) acres of land from the defendant-appellant S—C Motor Inn Corp. (seller), at

the intersection of highways I-95 and S. C. 6 in Orange-burg County. The defendant-appellant Roy A. Krell and Company, Inc. (realtor) was made a party because it was the realtor-agent negotiating the sale for the seller and has a substantial financial interest in the outcome of this litigation. Appeal is from an order of the lower court ordering recision.

There were concurrent findings of fact below to the effect that there were material misrepresentations by the seller as to the availability of sewage, water and a public golf course, a mutual mistake of fact as to sewage, no meeting of minds between the parties and hence no contract. The concurrent findings below, of misrepresentations as to the sewage system, are not only fully supported by the evidence, but are in accord with the clear preponderance thereof. The respondent being entitled to recision on this ground, we need not discuss whether or not it was also entitled to recision on other grounds.

By way of background the plaintiff-respondent, South-eastern, is a corporation wholly owned by another corporation, which is wholly owned by John W. Daniel of Danville, Virginia, who apparently owned several other corporations. He has been successfully engaged for a number of years in the development of properties, including motel properties. A key person in South Carolina Motor Inn Corporation is Mr. George Thomas of Atlanta, Georgia, who has been more or less engaged in the same type of business as Mr. Daniel. The two knew each other for years; had done business together, and were apparently on good terms. Roy A. Krell and/or his corporation acted as agent for South Carolina Motor Inn Corporation and has a substantial financial interest in this case. Mayo Clark, while an officer of Southeastern, was a recent employee thereof.

After considerable negotiations, the purchaser and seller entered into a written contract on June 22, 1972, the term of which provided that the purchase price of the 24 acre tract was $600,000.00. Six Thousand dollars ($6,000.00) was

paid upon execution and delivery of the contract. The contract provided that "$54,000.00 (was) to be paid into seller's account and held in escrow after contingencies set forth in paragraphs * * *, 13(b) and * * * have been satisfied."

The contingencies were to be cleared from the agreement within 30 days of acceptance of the contract by seller, or the seller at its option could elect to avoid the contract and return the $6,000.00 down payment.

The contract further provided that a final payment of $540,000.00 was to be paid upon delivery of a deed at the office of the realtor on or before December 30, 1972, such closing date having been later extended, however, until January 10, 1973.

Paragraph 13 (b) hereinabove referred to reads as follows:

"13. This contract is expressly contingent upon the following circumstances:

* * *

"(b) Evidence must be provided that a system adequate to provide sewage for the entire property can be installed either by a municipality or through a private lagoon system.

* * *."

On July 14, 1972 (about three weeks after the contract was executed), the realtor (Roy Krell) wrote the purchaser a letter as follows:

"Attached are letters and documents to answer the contingencies as stated in paragraph thirteen (13) of the contract between the S. C. Motor Inn Corp. and Southeastern Associates:

* * *

"13-(b-1) The same copy of act as furnished to you setting up by the S. C. Legislature, the Santee Public Service District to install sewerage and water in the Santee area.

(b-2) Copy of letter from Mr. John R. Floyd, Jr., District Engineer of the S. C. State Board of Health, as to approval of sewerage system on property.

"Note: These two factors do assure you that an adequate sewerage can be installed by a municipality or through a private system.

\* \* \*

"I sincerely believe that these items, more than satisfy, the contingencies of \* \* \*, b, \* \* \*, as you have a choice in decision with your selection."

With this letter Mr. Krell enclosed a copy of his commission as a member of the Public Service District. Following the receipt of Krell's letter of assurance the purchaser paid the additional $54,000.00, the remainder of the down payment, to the seller.

Before entering into the contract Mr. Daniel came to Santee, South Carolina to look over the real property involved. The purchase thereof was contemplated for the purpose of erecting thereon a Howard Johnson Motel. The asking price of the property was $24,000.00 per acre, and Mr. Daniel told Krell that the land was not worth that figure and would not pay that for it unless a sewage system could be provided without utilizing a portion of the property for any kind of sewage system or portion thereof. Krell assured Daniel and Clark that such a sewage system could be provided and even went to the extent of pointing out a lagoon on adjacent property which could be used as a sewage lagoon. Mr. Krell omitted to tell them, however, that such belonged to the State Highway Department instead of Krell, or his corporation, who also owned adjacent property.

Daniel's testimony is, we think, clearly corroborated by the terms of the contract itself, which required "evidence must be provided that a system adequate to provide sewage *for the entire property* can be installed either by a municipality or through a private lagoon system." (Emphasis added). A sewage system which would

utilize a substantial portion of the high priced acreage would not be one which provided "sewage for the entire property."

It has now been conclusively proved that no municipal or other public sewage was available and that under health regulations a private lagoon system is absolutely impermissible in the Santee area.

Proof that sewage was available, in accordance with the terms of the contract, was a prerequisite to obtaining the balance of the down payment in the amount of $54,000.00. In inducing Southeastern to make such payment, Krell did, and omitted to do, several things to mislead Southeastern. He induced Southeastern to rely heavily on the fact that he, Krell, was a commissioner serving on the Santee on the Santee Public Service District. He sent Southeastern a copy of his commission and a copy of the act which, *inter alia,* empowered the district to construct sewage facilities, etc. He sent to Southeastern the letter from Mr. Floyd, tentatively approving a sewage system, all on July 14, 1972. He was trying to, and did obtain, the $54,000.00 payment. What Mr. Krell did not tell was that he had a letter from Mr. Tindal, Mr. Floyd's superior, under date of July 11th, which countermanded everything Floyd had to say and put Krell on notice that the Health Department would have to have a great deal more information before it would consider approving a sewage system of any kind for the site. Mr. Krell also did not tell Southeastern that the voters in the district had recently rejected, on two occasions, financing a water and sewer system in the district, the last such rejection being just three days before Krell's letter of assurance. In brief, Krell knew when he wrote that a great deal more was required before a sewage system of any kind could be approved for the site and that there was little probability that there would be a public sewage system in the foreseeable future, all of which material information he withheld from Southeastern.

Krell apparently did not know that the off-site lagoon system contemplated by the parties was impermissible under Health Department regulations, and to this extent there was a mutual mistake of fact. But as to the remainder of the representations about the sewage system, there was not only misrepresentation on the part of Krell, but a withholding of vital information and an assurance on his part that Southeastern would have no problem with respect to sewage because he, Krell, was in a position as a public commissioner to satisfactorily solve all sewage problems. His official position was clearly used by him to induce Daniel and Clark to rely upon his representations.

In his letter on July 14th, Krell assured Daniel and Clark that they, in fact, had an option or choice as to two different specified, satisfactory means for providing sewage, to wit:

(1) A municipal or public system provided by the Santee Public Service District of which Krell was a commissioner.

(2) A plan as set forth in Floyd's letter.

In truth neither of such was available and the fact that neither was available was known to Krell, but not to Daniel and Clark.

It is, of course, true that a private sewage system for the area can be designed which would be approved by the State Board of Health on a temporary basis, but any such would utilize a considerable portion of the high priced acreage under contract, and as testified to by Mr. John C. Hawkins, an engineer with the South Carolina State Board of Health, the cost thereof was regarded by many developers as being prohibitive. In any event, it is clear that the only type of sewage disposal system which is currently permissible in the Santee area is not the low cost type of system contemplated by the parties to the contract when the contract was negotiated. Two motels in the area having recently approved sewage systems brought or were required to buy, 20 additional acres of land to take care of their sewage needs.

It is argued that the real reason that the purchaser did not comply with the contract is that it was unable to raise the necessary money. Admittedly there are excerpts from Mr. Clark's testimony which would support such a factual conclusion, but even Clark's testimony as a whole does not accurately reflect the fully story. Southeastern encountered some delay in completing plans with Howard Johnson due to the fact that Howard Johnson was considering a different type of project for this particular site. Under consideration was a pilot project of an economy motor lodge and camp ground. Howard Johnson thought the site was large enough for such a pilot project, but such was under study with particular reference to whether there was enough area for an adequate camp ground.

In December, approximately a month before the extended deadline for closing the contract, which was January 10, 1973, Mr. Daniel called Mr. Thomas and went to Atlanta to see him. He explained to Thomas the delays he had encountered; the reasons therefor, and that it would be possible, but a bit difficult for him to conclude the contract by the deadline because of substantial sums of money tied up in other projects at the moment. He proposed to Thomas that he, Daniel, put up an additional $30,0000.00 with the understanding that such would be applied to interest at the rate of $4,000.00 per month until such time as Daniel completed payment of the purchase price with any unused portion of the $30,000.00 to be applied on the purchase price. Thomas countered with the proposition that he put up $40,000.00 instead, but on the same terms and to this both Daniel and Thomas agreed. Thomas' agreement, however, was subject to approval by the group with which he was associated. Not long thereafter Daniel was advised that the other members of Thomas' group would not agree. Daniel's reaction was that Thomas' group was being entirely unreasonable under the circumstances and he decided that he should consult his attorney and ascertain whether or not the appellants had an enforcible contract.

Upon investigation by counsel, the duplicity of Krell, with respect to the sewage system, came to light and action was brought on January 6th, prior to the final date for closing the purchase contract. But, even if it be assumed that in fact Southeastern was totally unable, financially, to perform its contract that fact is no legal bar to its right to rescind the contract if it is otherwise entitled to rescision.

Much more could be said, but the foregoing should be sufficient to demonstrate that the clear weight and preponderance of the evidence is not against the concurrent findings below, at least with respect to the sewage system. It is worthy of note, we think, that Mr. Thomas, present in court, was not called as a witness for the purpose of controverting any part of Daniel's testimony. In fact, the only witness testifying for the appellants was Krell, and we find much of his testimony incredible.

We conclude that the misrepresentations as to the sewage system, alone, entitled the plaintiff to a recision of its contract and such conclusion renders unnecessary the discussion of any other issues in the case.

Affirmed.

Moss, C. J., and LEWIS, J., concur.

LITTLEJOHN and NESS, JJ., concur in result.

LITTLEJOHN, Justice (concurring):

I limit my concurrence to the result only. In my view, both the report of the master, concurred in by the circuit judge, and the majority opinion of this Court contain findings not supported by the record. At the same time, there is sufficient evidence to warrant an affirmance by this Court under the well-established rule that concurrent findings of the master and the trial judge will not be disturbed unless against the clear preponderance of the evidence.

NESS, J., concurs.